IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No.   1:23-mj-00026

UNITED STATES OF AMERICA,

    Plaintiff,

v.

DARION RAY SEXTON,

    Defendant.

---

### GOVERNMENT'S MOTION FOR ORDER OF DETENTION
### PURSUANT TO 18 U.S.C. § 3142(f)

---

The defendant told a friend he was going to burn down a church. A few hours later the front area of the church near his home was ablaze, fueled by an incendiary chemical oozing out of a shattered glass alcohol container stuffed with denim. Perhaps concerned that one incendiary device wouldn't do the job, the defendant broke the bottom window of the church and threw another flaming canister into the basement. The defendant's anti-social disregard for his community — this is Colorado, where uncontrolled fires at any time of year can be a matter of life or death — was simply the culmination of an escalating and disturbing series of behaviors. In high school, he posted a social media message warning his classmates not to come to school because he was going to "shoot the N's" with the "N" being shorthand for a vile racist slur against black people. Another witness told the FBI

1

that the defendant threatened to kill a homeless person. In July 2022 the defendant decided to make his fantasy someone else's nightmare: without warning or consent he hit a woman in the face during a sexual encounter.

Under no circumstances should the defendant be released to live with his parents just minutes away from a terrified religious community whose constitutionally-protected faith in their right to gather for worship safely and securely has been violently and perhaps irreparably cast into doubt. The defendant has a history of stated desires to commit heinous acts against some of Colorado's most vulnerable and traumatized communities and has demonstrated his ability to use common household materials to manufacture destructive devices to commit those acts. Confronted now with the real possibility that he has only limited time to realize his most macabre visions, he is both a danger to the community and a flight risk. For all of the reasons set forth below, he should be detained pending trial in this matter pursuant to 18 U.S.C. § 3142(f).

1. **Proffer of Facts Related to the Defendant's Crime, Violent History, and Personal Circumstances**

    A. The Government May Proceed by Proffer

The rules of evidence do not apply at a detention hearing and the Court has the discretion to proceed by way of proffer. 18 U.S.C. § 3142(f) (noting that proceedings may be by proffer); *see United States v. LaFontaine*, 210 F.3d 125, 130-131 (2d Cir. 2000) (finding no error in district judge's decision to accept proffer of defendant's danger to community and threatening behavior towards witnesses);

*United States v. Gaviria*, 828 F.2d 667, 670 (11th Cir. 1987) ("We hold that the government as well as the defense may proceed by proffering evidence subject to the discretion of the judicial officer presiding at the detention hearing."); *United States v. Delker*, 757 F.2d 1390, 1395-96 (3d Cir. 1985) (exploring legislative history of Bail Reform Act and concluding that district courts have discretion to conduct detention hearings by proffer).

The government proffers the relevant facts below, incorporating by reference the facts set forth in the affidavit supporting the complaint docketed at ECF No.1-2.

B.   The Defendant's Arson

As set forth in the affidavit supporting the complaint, ECF No. 1-2, the defendant sent a friend a snapchat on the evening of January 19, 2023, cavalierly proclaiming "yeah, I might go set a church on fire." "Isn't that a hate crime?" the friend responded before falling asleep.

The defendant answered that question just a few hours later, about a half hour before midnight. Stomping through the snow and taking no issue with the many other structures of his residential neighborhood, the defendant was captured on a camera affixed to the front entrance of the church closest to his house. Digital footage shows a masked arsonist matching the defendant's height and build throwing a "Molotov cocktail," at the church's front door.[1] The "cocktail" — a bottle

---

[1] The term "Molotov cocktail" is colloquially used to refer to a "crude hand grenade made of a bottle filled with a flammable liquid (as gasoline) and fitted with a wick or saturated rag taped to the bottom and ignited at the moment of hurling."

of watermelon rum stuffed with a denim rag and filled with something reeking of gasoline, bounced off. The defendant did not take the opportunity to pause and reflect that maybe what he was doing was a bad idea. Instead, he picked the object off the ground and threw it again. This time he hit the camera, which was engulfed in flames.

The defendant took deliberate action to follow up on his stated threat to set a church on fire. Even though the object he'd thrown at the front door was fueling a fire, he threw another watermelon rum bottle through the basement window. Once the window was open, he threw a flaming bottle into the exposed basement. This bottle was also stuffed with a denim rag and filled with a combustible liquid.

Fortunately, the Loveland Fire Department extinguished the front fire before it could spread and the church's emergency sprinklers doused the basement fire. The defendant ran from the church back to his home, leaving a trail of footprints in the snow.

The next morning, the defendant began tampering with evidence and otherwise trying to cover his more metaphorical tracks. He snapchatted the friend to whom he'd declared his intentions and asked the friend not to tell anyone about

---

*United States v. Ross*, 458 F.2d 1144, 1145 n.2 (5th Cir. 1972). The name comes from the crude bombs used by Finnish resistance fighters against Soviet forces in World War II. The Soviet Foreign Minister — Vychaeslav Molotov — had claimed that bombs being dropped on Helsinki were aid drops. The Finns responded by sarcastically adding Molotov's name to many of the weapons they dropped on Soviet tanks and soldiers.

what he'd said. When agents showed up at his doorstep the next day — almost literally following in his footsteps from the church to his house — he admitted what he couldn't deny and denied what he couldn't admit. Hands shaking nervously, he confessed that he'd been out walking around the church the night before, between 11 and 11:30, smoking after drinking some alcohol, wearing light-colored sweat clothes that could be pulled over his face to warm up. He denied seeing the fire and instead alluded to a mysterious person, for whom he could provide no physical descriptors, leaving the area of the church during his walk.

The FBI executed a warrant at the defendant's home later that night. They found shoes consistent with the size and tread of the footprints leaving the arson, shredded and torn blue jeans made of fabric matching the wicks on the Molotov cocktails, clothes with the stench of petrol, and a plastic bottle with a similar odor matching what investigators found in the church basement. The Loveland police and the FBI later found video footage and receipts showing that the defendant bought two bottles of distinctive Admiral Nelson's Watermelon Rum two days before the arson.

### C. The Defendant's Prior Concerning Behavior

The defendant has a history of volatile threats and other concerning behavior. The decision to burn down a church did not happen on a whim. It was the fulfillment of a long process in which the defendant would voice his disturbed desires, probe the response, and then see how much further he could take it.

In 2017, while still in high school, he admitted to the police that he had posted a message threatening to shoot the Black people at this school. He told the police it was a just a "joke," wouldn't actually do it, and had seen others making similar comments.

But the "jokes" didn't stop and having the police at his doorstep asking questions about his behavior had no deterrent effect. Friends reported to the FBI that the defendant continued to make strange and disturbing comments, including a stated intention to kill a homeless person. And as noted above at the beginning of this motion, in July 2022 the defendant rounded the corner from thought to action by striking a woman in the face, without prompting, while having sex. This step on a path to violence was followed a few months later with the defendant manufacturing two destructive devices in this home to bomb a neighborhood church.

### 2.   Legal Standard — the Bail Reform Act

The Bail Reform Act, 18 U.S.C. § 3141 *et seq.*, authorizes the defendant's detention pending trial. The law presumes that some categories of defendants — such as those charged with crimes involving dangerous weapons, violence, and drugs — should be detained. 18 U.S.C. § 3142(f)(1). *United States v. Muhtorov*, 702 F. App'x 694, 698 (10th Cir. 2017).

A finding of risk of flight must be supported by a preponderance of the evidence and a finding of danger to the community must be supported by clear and convincing evidence. 18 U.S.C. § 3142(f); *United States v. Cisneros*, 328 F.3d 610,

6

616 (10th Cir. 2003).

The Bail Reform Act directs that four factors be considered in the detention analysis: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including, among other things, the person's family ties, financial resources, length of residence in the community, and whether the defendant was under supervision when he committed the alleged offense; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

### 3. The Defendant is a Danger to the Community and a Flight Risk

For the reasons stated below, the first three factors to be considered by courts in ordering pretrial detention weigh heavily in favor of detention in this case.

A. <u>The charged crime of arson is among the most serious anyone can ever commit</u>

Fires ravage Colorado with alarming frequency. Just last winter, in December 2021, the Marshall Fire in Boulder County killed two people and burned down over a thousand structures in the suburban area of Superior and Louisville. Hundreds of people were rendered homeless or without the businesses that were their livelihoods. Many are still suffering. Fires like this are discussed in the media, at community events, and on social media so routinely that everyone who lives in Colorado for any length of time becomes inured to the grave risks of conflagration.

The defendant, no doubt aware of these risks, ignored them. He intentionally put the lives and livelihoods of everyone in his neighborhood at risk to gratify his

7

own impulses.

As if this generalized sense of dread were not enough, the defendant's actions deliberatively and specifically targeted a religious community whose sense of security and trust is now broken. Crimes that target churches stoke a particular kind of terror because churches rely on trust to exercise their religious faith fully and completely and to build welcoming communities based on their beliefs and values. Crimes against churches strike at the core of the liberties protected by our Constitution.

The defendant's conduct here was focused — he targeted a church — and capricious — he decided to realize this goal seemingly on a whim after drinking heavily and talking to one of his friends. That rash conduct unpredictably compounds his dangerousness by making it impossible to predict what he might do and when he might do it.

The suspense is heightened by the nature and circumstances of this particular crime. The defendant lived with other adults — his parents — who were in the best possible position to evaluate, supervise and influence his behavior and he'd already been visited by police regarding a violent threat. None of that stopped him from taking common household items and assembling several destructive devices whose sole purpose is to maim, kill, and terrorize (the Molotov cocktail's origins in war are not accidental and its status as a potent symbol of rage is well-earned).

The very nature of this crime demonstrates by clear and convincing evidence that the defendant is a danger. But because the law recognizes that danger and imposes severe penalties, it also creates a natural incentive to flee into the vast interior of the United States or abroad. The charge carries with it a mandatory minimum sentence of 5 years and a maximum sentence of 20 years. He faces the possibility of additional charges with equal or even more serious penalties, including violations of the Church Arson Prevention Act, 18 U.S.C. § 247.[2] These are among the most serious consequences the defendant has ever faced and, in combination with the erratic and questionable judgment underlying the crime, are enough to create a strong incentive to flee. To turn another fantasy — escape from a likely prison sentence — into reality.

B. <u>The Weight of the Evidence is Heavy, Further Increasing the Incentive to Flee</u>

The evidence detailed in the complaint demonstrates the heavy weight of the evidence here. The defendant's crime left behind a trail of footprints from the scene of the crime to his front door. Behind that door was even more:

- The arsonist captured on the church's doorbell camera shows a figure generally matching the defendant's physical build and wearing clothing substantially similar to what the defendant admitted wearing that night. Clothing consistent with what is seen in the video was found in the defendant's residence, stinking of gasoline.

---

[2] This charge must be approved by the Attorney General, through his designee. 18 U.S.C. § 247(e). Thoughtfully evaluating whether that charge, as well as a charge under 18 U.S.C. § 924(c)(1)(B)(ii) that carries a thirty-year mandatory minimum, is in the public interest and necessary to secure substantial justice requires an analysis of many factors and will take additional time.

- The footprints in the snow leading from the church to the front and back doors of the defendant's home are approximately 11 inches long. So were the shoes he was wearing the next day. While others might have that same shoe size, the fact that the defendant kept a pair of Nike shoes with the same tread pressed into the snow is strong evidence that he is the one who made those foot prints.

- The fabric that served as the wick for the destructive devices was denim in appearance. The defendant had a pair of shredded blue jeans in his room along with a knife that would have been useful to make rag strips. He also had a more-sophisticated-and-capable than usual butane lighter (it was not your usual Bic).

- Investigators found a plastic bottle stuffed with a denim-type rag and a foul-smelling liquid (benzene is the chemical that creates the distinctive smell associated with gasoline, but it is found in many other types of flammable liquids and the authorities have not yet definitively identified the liquid). They found a similar plastic bottle with a similar stench in the trash at the defendant's home.

- The defendant can be seen on a video from a local liquor store purchasing two bottles of Admiral Nelson's Watermelon rum two nights before the arson. Two of those bottles — both shattered and one burnt — were recovered from the church with still-legible labels.

- The defendant admitted to being near the scene of the crime when it happened and door cameras at his home and the home of a neighbor show him leaving his residence in roughly the same time period of the crime.

- A witness who knows the defendant listened to his stated intent to burn down a church and, later, evidence of his guilty conscience in the form of a corrupt request not to tell anyone else about it.

C. <u>No Aspect of the Defendant's Character, Family Ties, Employment, Past Financial Conduct or Other History Diminishes the Risk of Flight or Danger</u>

The defendant does not have a criminal history. But that is also true of approximately 1/3 of all of the mass shooters identified in a recent Secret Service study of mass attacks in public spaces between 2016 and 2021. *See* United States

Secret Service, *Mass Attacks in Public Spaces: 2016-2020* at 23 (Jan. 2023), available at https://www.secretservice.gov/sites/default/files/reports/2023-01/usss-ntac-maps-2016-2020.pdf (the "Secret Service Study").

The defendant did not commit a mass shooting. But he has threatened one in the past and he did commit an arson on a public space that, had conditions been different, may have resulted in mass casualties. His history and characteristics are consistent with those found among mass shooters in the study referenced above including (1) a history of threatening and harassing behavior, (2) an act of violence against an intimate partner, (3) comments showing a fascination with, or interest in, violence, hate and killing, and (4) substance use (his admitted drinking on the night of the attack). *See* Secret Service Study at 40-41. All of these factors — recognized in § 3142 — weigh in favor of detention.

Taken together, the available evidence paints a portrait of a profoundly disturbed young man prone to unpredictable paroxysms of violence who has been making provocative threats for years. Typically, the fact that he has close ties to the community in the form of his parents would weigh against detention. Here, it raises concern: those parents did not notice or did not address any of these concerning behaviors and the defendant was able to commit the crime by using his parents' home as his base of operation and as the source of his materials. The credit card used to purchase the watermelon rum two days before the fire belonged to the defendant's stepfather. This strongly suggests that even if the defendant has close

ties to his community, those ties do not prevent him from carrying out acts of violence and, instead, give him the means to do so.

### D. Summary of The Many Factors Supporting Detention

All of the factors the court must consider under § 3142 support detention in this case.

- The law itself presumes that a defendant charged with this crime is both a flight risk and a danger. *See, United States v. Gonzalez*, 149 F.3d 1192, 1998 WL 321218, at *2 (10th Cir. 1998) (not published) (explaining the proposition that a district court may presume a risk of fight in cases falling under 18 U.S.C. § 3142(f)(1) and "may not ignore the presumption"). The court can consider this presumption as a factor favoring detention, even if the defendant satisfies the very low burden of rebutting it by producing some evidence. *United States v. Cook*, 880 F.2d 1158, 1162 (10th Cir. 1989) (noting that "once the burden of production is met, the presumption does not disappear, but rather remains as a factor for consideration in the ultimate release or detention determination.")

- The nature and circumstances of the crime favor detention. This is a serious crime with a mandatory minimum sentence carried out with no warning against a place of religious worship using means — uncontrolled fire — that put everyone in that neighborhood at risk. The defendant did this even though he'd had a prior encounter with the police and even though he'd been confronted with the suggestion that his intentions amounted to a hate crime.

- The defendant manufactured several destructive devices using common household materials. The only reasonable way to ensure he has no means to do this again is with detention in a facility where those materials are tightly controlled and the defendant can be monitored at all times.

- The possibility of a lengthy sentence is compounded by the considerable strength of the evidence.

- The defendant was under close personal supervision from other adults with moral suasion over him. This had no deterrent effect.

- The defendant's employment history is tenuous, his ties to his parents were insufficient to stop his crime, and few others have sufficiently meaningful influence over him to either deter additional crimes or to prevent ill-considered decisions.

### E.     Alternatives to Detention are Inadequate

Alternatives to detention are inadequate in this case to ensure the safety of the community and the continued appearance of the defendant:

- Home Detention with other conditions.   Releasing the defendant with conditions that would place him at the residence he shares with his parents would be releasing the defendant to live less than a thousand feet from the community he just traumatized surrounded by all of the common materials he needs to make more destructive devices. An ankle monitor would not stop him from going to the church or give sufficient warning should he attack it again. The parents who lived with him before the attack are not in a position to stop him from carrying out another attack and should not be placed in the unfair position of acting as *de facto* jailers. His prior residence is not an appropriate place for him to reside while this matter is pending and the government objects to any such release plan.

- Residential Reentry Center. A residential reentry center some distance away from the victim church might provide the kind of disinterested supervision and structure necessary to protect the community and prevent the defendant from fleeing. But because arson is such a terrible crime, centers in the area might not be comfortable hosting a suspected arsonist in a densely occupied residential structure. Even if one did, and had bed space, the government remains concerned that the circumstances of his crime and his demonstrated ability to manufacture incendiary devices from common materials mean placement in a residential reentry center just shifts the danger from one community to another, without the full safeguards available at a full detention facility. Moreover, offenders often walk away from residential reentry centers, and that possibility counsels against such placement here.

**4.      CONCLUSION**

The evidence in this case will show beyond a reasonable doubt that the defendant wanted to burn down a church and then took multiple steps to do so. His crime is among the most serious someone can commit, with some of the most serious consequences. Furthermore, the defendant's commission of the crime took place against a background suggesting that he is hostile to his community, dangerous to it, and would face no hesitation in either fleeing from it or attacking it. He should be detained.

Respectfully submitted,

COLE FINEGAN
United States Attorney

By:      */s Bryan Fields*
Bryan Fields
Assistant United States Attorney
U.S. Attorney's Office
1801 California St. Suite 1600
Denver, CO 80202
(303) 454-0100
Bryan.Fields3@usdoj.gov
Attorney for the Government

## CERTIFICATE OF SERVICE

  I hereby certify that on January 26, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to any and all counsel of record.

              *s/ Bryan David Fields*
              United States Attorney's Office